UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| A.L.,<br><br>        Plaintiff,<br><br>   v.<br><br>KILOLO KIJAKAZI,<br><br>        Defendant. | Case No. 20-cv-02245-VKD<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 20, 22 |

Plaintiff A.L.[1] appeals from a final decision of the Commissioner of Social Security ("the Commissioner")[2] denying her applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 423, 1381, *et seq*. A.L. contends that the administrative law judge ("ALJ") erred in four respects. First, A.L. contends that the ALJ improperly weighed the medical opinions of her treating psychiatrist Dr. Haycraft. Second, she contends that the ALJ improperly evaluated her own testimony. Third, she contends that the ALJ failed to consider statements submitted by A.L.'s mother. Fourth, she contends that the ALJ erred in assessing her residual functional capacity ("RFC") and in finding that she can perform the occupations of small product assembler, packing

---

[1] Because opinions by the Court are more widely available than other filings, and this order contains potentially sensitive medical information, this order refers to the plaintiff only by her initials. This order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi, Acting Commissioner of Social Security, is substituted as defendant in place of Andrew Saul.

line worker, and laundry folder.

The parties have filed cross-motions for summary judgment. The matter was submitted without oral argument. Upon consideration of the moving and responding papers and the relevant evidence of record, for the reasons set forth below, the Court grants A.L.'s motion for summary judgment and denies the Commissioner's cross-motion for summary judgment.[3]

## I. BACKGROUND

On February 19, 2016, A.L. applied for disability insurance benefits and supplemental security income, when she was 36 years old, alleging that she has been disabled since November 23, 2014 due to bipolar disorder, anxiety, depression, left leg tightness, and numbness in part of left foot. AR[4] 96, 111.

A.L. has a high school education and attended some college. AR 51. Her prior work includes jobs as a restaurant hostess, an on-site coordinator for a youth social services agency, and a sales representative at a bike shop. AR 53–59. Since November 2014, she has worked only part-time or approximately no more than 20 hours per week. AR 51–52.

A.L.'s applications were denied initially and on reconsideration. AR 108, 123, 142, 160. The ALJ held a hearing and subsequently issued an unfavorable decision on September 26, 2018. AR 35, 94. The ALJ found that A.L. met the insured status requirements of the Act through March 30, 2020 and had not engaged in substantial gainful activity since November 23, 2014. AR 27. The ALJ further found that A.L. has the following severe impairments: "mild cervical degenerative disc disease, headaches, and bipolar disorder." AR 27. However, the ALJ concluded that A.L does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 27–29.

The ALJ determined that A.L. has the RFC to perform light work, as defined in 20 C.F.R.

---

[3] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 7, 13.

[4] "AR" refers to the certified administrative record lodged with the Court. Dkt. No. 17.

§§ 404.1567(b) and 416.967(b), except as follows:

> [A.L.] can occasionally climb ladders, ropes, or scaffolds and frequently perform other postural maneuvers such as stooping, crouching, and crawling. She can occasionally reach overhead. She must avoid concentrated exposure to hazards. She could do simple routine tasks with only occasional public contact. She could do work that is task-oriented and not production pace.

AR 29. The ALJ concluded that although A.L. could not perform any past relevant work, she was able to perform other jobs existing in significant numbers in the national economy, including small product assembler, packing line worker, and laundry folder. AR 33-35. Accordingly, the ALJ concluded that A.L. was not disabled.

On February 10, 2020, the Appeals Council denied A.L.'s request for review of the ALJ's decision. AR 1–4. A.L. then filed this action seeking judicial review of the decision denying her applications for benefits. Dkt. No. 1.

## II.   STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits. The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. *Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) (citation omitted); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (citation omitted). In this context, the term "substantial evidence" means "more than a mere scintilla" but "less than a preponderance" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ahearn*, 988 F.3d at 1115 (internal quotation marks omitted) (first quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); and then quoting *Molina v. Astrue*, 674 F.3d 1104, 1110-11 (9th Cir. 2012), *superseded by regulation on other grounds)*; *see also Morgan*, 169 F.3d at 599 (citation omitted). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Ahearn*, 988 F.3d at 1115 (citation omitted); *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the Commissioner.

3

*Ahearn*, 988 F.3d at 1115-16 (citation omitted); *Morgan*, 169 F.3d at 599 (citation omitted).

**III.     DISCUSSION**

A.L. raises four challenges to the ALJ's decision.  First, A.L. argues that the ALJ erred in assigning only "partial weight" to the medical opinions of treating psychiatrist Daniel Haycraft, M.D., and that the ALJ was required to credit his opinion as a matter of law.  Second, A.L argues that the ALJ erred in discounting A.L.'s statements concerning her symptoms as "not entirely consistent" with the medical evidence and other evidence in the record.  Third, A.L. argues that the ALJ did not consider the lay witness statement of A.L.'s mother regarding A.L.'s symptoms and limitations.  Fourth, A.L. argues that the ALJ erred in assessing her RFC by failing to account for the ALJ's limitation of production-paced work as defined by the ALJ, and by failing to give adequate weight to Dr. Haycraft's opinions.

**A.     Assessment of Treating Physician Dr. Haycraft's Opinions**

The ALJ appears to have considered only Dr. Haycraft's opinions as expressed in his April 27, 2016 short-form evaluation (AR 644–48) and June 7, 2016 medical source statement (AR 686–90).  AR 32–33.  In his short-form evaluation, Dr. Haycraft wrote that A.L.'s principal diagnosis was "bipolar disorder."  AR 644–48.  He found that although A.L. was "well-groomed" and "cooperative," she had "agitated" motor activity, "rapid" and "pressured" speech, and "poor impulse control."  AR 644.  Similarly, Dr. Haycraft found that A.L.'s concentration and judgment were "impaired" to a "moderate" or "mild" degree, and that she experienced auditory hallucinations.  AR 645–46.  Using checkboxes to rate A.L.'s ability to perform various activities, Dr. Haycraft found that A.L had a "good" ability to understand, remember, and carry out both simple and complex instructions.  AR 647.  He found that she had a "fair" ability to maintain concentration, attention, and persistence; perform activities within a schedule and maintain regular attendance; interact appropriately with the public; and interact appropriately with coworkers.  AR 647.  Finally, Dr. Haycraft found that A.L. had a "poor"[5] ability to complete a normal workday

---

[5] The form defined the word "poor" as "[t]he evidence supports the conclusion that the individual cannot usefully perform or sustain the activity."  AR 647.

and workweek without interruptions from psychologically based symptoms; interact appropriately with supervisors; and respond appropriately to changes in a work setting. AR 647.

In his medical source statement, Dr. Haycraft found that A.L. was limited to a "moderately severe"[6] degree in her ability to remember locations and work-like procedures; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and to respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. AR 687–88. Dr. Haycraft also found that A.L. was limited to a "moderate"[7] degree in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure); complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods [Dr. Haycraft checked this statement in two categories: moderate and moderately severe]; and be aware of normal hazards and take appropriate precautions. AR 687–88. In addition, the form specifically instructs medical sources: "[D]o not include limitations which would go away if the individual stopped using drugs or alcohol." AR 686 (emphasis in original).

The ALJ gave only "partial weight" to Dr. Haycraft's opinions, which she explained as follows:

---

[6] The form defined a "moderately severe" limitation as "[a] limitation which seriously interferes with the individual's ability to perform the designated activity, and precludes the ability to perform the designated activity **on a regular and sustained basis, *i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule**." AR 686 (emphasis in original).

[7] The form defined a "moderate" limitation as "[a] limitation which seriously interferes with the individual's ability to perform the designated activity **on a regular and sustained basis, *i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule**." AR 686 (emphasis in original).

> [T]here is no evidence [A.L.] would have a poor ability to interact with supervisors or respond to changes in the work setting. The medical evidence of record shows the claimant did not usually complain about serious problems with adaptation and managing herself. Observations of treating practitioners generally show the claimant had no deficiencies in hygiene and wore appropriate attire. She was the primary caregiver for her 11-year-old son and she lived independently.

AR 33.

A.L. contends that the ALJ erred in giving only "partial weight" to Dr. Haycraft's opinions because she did not provide sufficient reasons for discounting his opinions. Dkt. No. 20-1 at 8–12; Dkt. No. 23 at 2. A.L. also takes issue with the ALJ's reasoning, arguing that "[A.L.'s] ability to maintain her personal hygiene or wear appropriate attire to a medical appointment with a familiar and trusted doctor does not translate to an ability to respond appropriate to supervisors in a work setting or to manage unexpected changes in the work setting without serious worsening of her symptoms." *Id.* at 4. The Commissioner argues that (1) the ALJ properly assigned greater weight to the opinions of non-examining sources Harvey Balik, Psy.D., and Thomas Stern, Ph.D., who reviewed A.L.'s disability benefits applications at the initial and reconsideration levels, respectively; and (2) the ALJ did provide specific and legitimate reasons for assigning Dr. Haycraft's opinions only partial weight. Dkt. No. 22 at 5–9. The Court agrees with A.L.

For Social Security applications filed before March 27, 2017, under the "treating physician rule," "[t]he medical opinion of a claimant's treating doctor is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also* 20 C.F.R. § 416.927(c)(2) (2016) (same). "When a treating doctor's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency with the record." *Revels*, 874 F.3d at 654 (citing 20 C.F.R. § 404.1527(c)(2)–(6)); *see also* 20 C.F.R. § 416.927(c)(2)–(6) (same).

When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must do two things. First, the ALJ must consider other factors, including the length of the

6

treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician. 20 C.F.R. § 416.927(c)(2)–(6); *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing 20 C.F.R. § 404.1527(c)(2)–(6)). Consideration must also be given to other factors, whether raised by the claimant or by others, or if known to the ALJ, including the amount of relevant evidence supporting the opinion and the quality of the explanation provided; the degree of understanding a physician has of the Commissioner's disability programs and their evidentiary requirements; and the degree of his or her familiarity with other information in the case record. 20 C.F.R. §§ 416.927(c)(6), 404.1527(c)(6) (2016); *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). The failure to consider these factors, by itself, constitutes reversible error. *Trevizo*, 871 F.3d at 676.

Second, the ALJ must provide reasons for rejecting or discounting the treating physician's opinion. Here, because Dr. Haycraft's opinions are contradicted by the opinions of Drs. Balik and Stern, the ALJ was required to provide "specific and legitimate reasons" for rejecting or discounting the treating physician's opinion, supported by substantial evidence. *Id.* at 675. "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quotations and citation omitted).

With respect to the ALJ's first responsibility—consideration of other factors—the ALJ did not address any of the factors listed under 20 C.F.R. § 404.1527(c)(2)–(6), which provides:

> When we do not give the treating source's medical opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the medical opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.

20 C.F.R. § 404.1527(c)(2). In the Ninth Circuit, "[t]he ALJ is *required* to consider the factors set out in 20 C.F.R. § 404.1527(c)(2)–(6) in determining how much weigh to afford the treating physician's medical opinion."). *Ghanim v. Golvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (emphasis added). The ALJ did not discuss any of the factors as relevant to Dr. Haycraft. *See* AR 32–33. This failure alone constitutes legal error. *Trevizo*, 871 F.3d at 676.

With respect to the ALJ's second responsibility—providing reasons for rejecting or discounting the treating physician's opinion—the ALJ did not provide specific and legitimate reasons for discounting Dr. Haycraft's opinions. First, the ALJ found that "there is no evidence [A.L.] would have a poor ability to interact with supervisors or respond to changes in the work setting. The medical evidence of record shows the claimant did not usually complain about serious problems with adaptation and managing herself." AR 33. However, the ALJ's assessment is not supported by substantial evidence. Dr. Haycraft's treatment notes document A.L.'s hospitalization for mental health treatment on July 15, 2015 after she expressed thoughts of driving her car into a tree, AR 511, her resignation from a job (recorded by Dr. Haycraft on October 20, 2015) due to her absenteeism and inability to motivate herself to go to work, AR 609, and her continuously feeling "anxious [and] jittery," AR 609. From January 2016 through March 2016, A.L. continued to experience occasional auditory hallucinations and thoughts of self-harm, along with "a lot of mood volatility"; she was "anxious, tearful, easily triggered by authority figures which interferes with her ability to function in her job role." AR 630. Dr. Haycraft's treatment notes regarding A.L.'s ability to adapt and manage herself are consistent with another treating physician's notes in the record. Shortly before A.L.'s onset date of November 23, 2014, Charles Hudson, M.D., wrote on October 13, 2014 that A.L.'s symptoms "intrude in her work which is otherwise going well," AR 566. On February 18, 2015, Dr. Hudson also observed that A.L.'s voices in her head were "intensifying" and that she had been unable to work as a result of her symptoms; further, A.L. had found it "more difficult to be engaged with her son." AR 578. The ALJ appears to have overlooked this evidence in the record.

Second, the Court is not persuaded that the ALJ's second reason that A.L. generally "had no deficiencies in hygiene and wore appropriate attire" at her medical appointments supports the ALJ's conclusion that Dr. Haycraft's opinions about A.L.'s ability to adapt and manage herself in the workplace should be discounted. As A.L. argues, "[her] ability to maintain her personal hygiene or wear appropriate attire to a medical appointment with a familiar and trusted doctor does not translate to an ability to respond appropriately to supervisors in a work setting or to manage unexpected changes in the work setting without serious worsening of her symptoms," Dkt.

No. 23 at 4, and the ALJ has not explained why it should so translate.

Third, the ALJ found that A.L. "was the primary caregiver for her 11-year-old son[8] and she lived independently," AR 33, but this was not a specific and legitimate reason to discount Dr. Haycraft's opinions because the ALJ did not develop the record regarding the extent of A.L.'s responsibilities in caring for her son from the onset of her disability on November 23, 2014 to the date of the hearing. At the hearing, the ALJ asked: "What kinds of things do you do with your 14-year-old?" AR 80. A.L. responded: "We sit at home a lot, and he plays on his phone. I don't go out very much because I have a lot of paranoia." AR 80. A.L. went on to describe activities such as "toss[ing] the football around, but not very often," and "spend[ing] time at the pool," during which A.L. would "sit on the sidelines." AR 80. Sometimes A.L. would go to the beach or go fishing with her son, but she added that "that's kind of difficult for me." AR 81. A.L.'s participation in these occasional recreational activities is not substantial evidence of an ability to interact with supervisors appropriately or to respond to changes in the work setting. Furthermore, the ALJ's characterization of A.L.'s caregiving relationship to her son during her period of disability is not supported by substantial evidence, as Dr. Hudson's October 3, 2016 notes reflect that A.L.'s son moved to Colorado "permanently" to be with his father there, and that A.L. would "no longer have primary custody." AR 797. Even in the year prior, Dr. Hudson's February 18, 2015 notes reflected A.L.'s concern that she found "it is more difficult to be engaged with her son which had been a symptom she had had when [Dr. Hudson] initially began seeing her." AR 578.

Accordingly, the Court finds that the ALJ did not follow the required methodology for evaluating a treating physician's medical opinion, and did not provide specific and legitimate reasons, supported by substantial evidence, for discounting Dr. Haycraft's opinions.

### B. Assessment of A.L.'s Subjective Testimony

A.L. argues that the ALJ improperly discounted her subjective testimony that she cannot work full-time because she finds it hard to cope with everyday interactions with people due to the severity of her symptoms, which include auditory hallucinations and anxiety. Dkt. No. 20-1 at

---

[8] The record reflects that at the time of the hearing before the ALJ, A.L.'s son was fourteen, not eleven. AR 80.

16–19. The Commissioner responds that the ALJ properly found A.L.'s testimony not entirely consistent with the record. Dkt. No. 22 at 14–18. The Court agrees with A.L.

In assessing a claimant's subjective testimony, an ALJ conducts a two-step analysis. First, "the claimant 'must produce objective medical evidence of an underlying impairment' or impairments that could reasonably be expected to produce some degree of symptom." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (*quoting Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996)). If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can reject the claimant's testimony as to the severity of the symptoms "'only by offering specific, clear and convincing reasons for doing so.'" *Id*. (*quoting Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) ("We therefore review the ALJ's discrediting of Claimant's testimony for specific, clear, and convincing reasons.").

Here, A.L. testified that as to the severity of her symptoms dating back to 2003 through the hearing date. AR 60–81. She testifies that she "suffer[s] from bipolar disorder. [She] also [has] anxiety and depression, but the anxiety and the, the manic state of the bipolar cause [her] to hear voices and it makes it difficult for [her] to function. Whether it be at work, at meetings that [she] go[es] to, out in society, just visiting with friends, recreational activities." AR 59. According to A.L., her "mania [had] increased, and the anxiety [had] increased." AR 70. She also had "nightmares almost every night." AR 70. Since 2014, the voices in A.L.'s head have "been more intrusive." AR 72. These symptoms of mania made "it hard for [A.L.] to cope," whether with "interactions with her son, with the teller at the grocery, at the bank, or the cashier at the grocery store, when [] taking [her] clients out to go [] grocery shopping." AR 73. She described having to cancel shifts or leave early at least one to three days a month. AR 73. Further, when asked by her attorney if her depression ever prevented her from leaving her home, she replied, "One day a month, maybe." AR 76.

The ALJ found that A.L.'s medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, she also found that A.L.'s statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence in the record. AR 30. Since the ALJ did

10

1  not identify any affirmative evidence of malingering, she was required to provide "specific, clear
2  and convincing reasons" for this determination. *Tommasetti*, 533 F.3d at 1039 (citation and
3  internal quotation marks omitted). The Court finds the ALJ failed to do so.
4        The ALJ discounted A.L.'s testimony about her symptoms because "[t]he medical records
5  reveal that the medications have been relatively effective in controlling the claimant's symptoms.
6  When she is on medications, she is able to function despite auditory hallucinations." AR 30. The
7  ALJ cited no basis for these assertions, nor did she clarify what degree of "functioning" A.L.
8  demonstrated despite her auditory hallucinations. *See* AR 30. Citing "Exhibit 15F/34," the ALJ
9  wrote: "Notes stated that she was not taking medications as prescribed which may be contributing
10  to auditory hallucinations." The cited exhibit contains A.L.'s medical records and treating
11  providers' notes between August 29, 2017 and November 16, 2017. AR 871–905. It reflects that
12  on one occasion (August 29, 2017), A.L. expressed a desire for a higher dose of Oxcarbazepine, as
13  she realized that she had only been taking one-half the prescribed dosage. AR 903. According to
14  the treating provider's notes, A.L. herself thought "this may be contributing to the increase in
15  auditory hallucinations over the past month." AR 903. The provider, Paula Pelavin, P.A., did not
16  express an opinion on the effect of this dosage on A.L.'s auditory hallucinations. AR 903–904.
17  Moreover, the cited exhibit reflects that on September 21, 2017, when A.L. was taking a higher
18  dosage of Oxcarbazepine, the treating provider, Michael Bartos, M.D., noted that "[a]uditory
19  hallucinations have been prominent, even today." AR 894–96. One month later, the same doctor
20  noted on October 31, 2017, A.L. "recently had acute worsening of auditory hallucinations and
21  anxiety," even though she "enjoy[s] her work at the cat adoption agency." AR 879. These
22  treatment records, viewed together, do not provide substantial evidence to support the ALJ's
23  conclusion that A.L.'s auditory hallucinations do not seriously impair her functioning when she
24  takes her medications.
25        The ALJ also discounted A.L.'s testimony because she found that, in 2018, treatment notes
26  reflect that A.L. "was better overall, playing softball most Saturdays, and she was able to continue
27  to work and was increasing her hours (Exhibit 17F/5, 9, 11). The claimant was able to learn
28  coping tools for auditory hallucinations. Notes stated she was functioning through working, even

11

attaining a second job, attending narcotics anonymous, and her programs (Exhibit 13F)." AR 30. However, these reasons for discrediting A.L.'s testimony are not specific, clear, and convincing. As the Ninth Circuit has emphasized, "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison*, 759 F.3d at 1017.

In support of her reasoning, the ALJ cited notes from March 27, 2018 ("She reports doing better overall, less depressed, not having self-deprecating thoughts, voices are much less.") (AR 938), April 3, 2018 ("Has been playing softball most Saturdays which seems to help [A.L.'s neck pain] but then worsening the pain overall.") (AR 936), and April 12, 2018 ("She is able to continue working and is increasing her hours.") (AR 932). To support the assertion that A.L. "was able to learn coping tools for auditory hallucinations" and that she "was functioning through working, even attaining a second job, attending narcotics anonymous, and her programs," the ALJ also cited a letter from Catherina Forsythe, L.M.F.T., who summarized in a single paragraph her sixteen therapy sessions with A.L., held between August 23, 2017 and January 16, 2018. AR 823. However, Ms. Forsythe's notes do not state that the "mindfulness and grounding tools" she taught A.L. were effective in treating A.L.'s auditory hallucinations, and indeed, Ms. Forsythe wrote that "Ct [client] was continuously unstable stating new medications as the cause" and that A.L. "was struggling to get regulated on her meds." AR 823. Nor do Ms. Forsythe's notes explain how many hours A.L. worked during the week with the addition of a second job, and whether this amounted to full-time work. AR 823.

In sum, the records cited by the ALJ do not provide substantial evidence for her conclusion that A.L. was "functioning" adequately despite her auditory hallucinations and anxiety. The ALJ's discussion of the evidence ignores other evidence in the record that contradicts the ALJ's conclusions. *See Ahearn*, 988 F.3d at 1115 ("To determine whether substantial evidence supports the ALJ's determination, we must assess the entire record, weighing the evidence both supporting and detracting from the agency's conclusion.") (citation omitted); *see also Williams v.*

12

*Colvin*, No. ED CV 14-2146-PLA, 2015 WL 4507174, at *6 (C.D. Cal. July 23, 2015) ("An ALJ may not cherry-pick evidence to support the conclusion that a claimant is not disabled, but must consider the evidence as a whole in making a reasoned disability determination.") (citing *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001)).

Accordingly, the Court finds that the ALJ did not provide clear and convincing reasons for discounting A.L.'s testimony about her auditory hallucinations and anxiety and their impact on her ability to work.

### C. Assessment of Lay Witness Statements

A.L. argues that the ALJ improperly rejected her mother's statements about A.L.'s inability to stay with one job due to her emotions. Dkt. No. 20-1 at 19–20. The Commissioner concedes that the ALJ did not provide any reasons for failing to discuss A.L.'s mother's statements but argues that this was harmless error. Dkt. No. 22 at 19–20. The Court agrees with A.L.

A.L.'s mother, Cynthia Aultman, completed a third-party function report on April 25, 2016 in connection with A.L.'s disability applications. AR 368–75. Ms. Aultman reported that A.L.'s "emotions . . . make it very hard to stay with one job. She will often have to just leave a situation to keep from losing control. Most jobs can't accept that. Just the drive alone is hard." AR 368. Ms. Aultman also stated that "[A.L.'s] 12 year old son is able to do a lot for himself but she makes his meals, laundry and housework." AR 369. Ms. Aultman also confirmed A.L.'s symptom of "hearing voices causing paranoia." AR 373. The ALJ did not refer to this evidence in her decision.

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Commissioner of Social Security Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). "Indeed, lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence … and therefore cannot be disregarded without comment." *Id.* (citations and internal quotation marks omitted). "Consequently, if the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." *Id.* (citations and internal quotation marks omitted). However,

an ALJ is not required to "discuss every witness's testimony on a[n] individualized, witness-by-witness basis. Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina*, 674 F.3d at 1114. "Where lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony, it would be inconsistent with our prior harmless error precedent to deem the ALJ's failure to discuss the lay witness testimony to be prejudicial per se." *Id*. at 1117.

Here, the Commissioner argues that "the ALJ's failure to discuss Plaintiff's mother's testimony was harmless because it was nearly identical to Plaintiff's testimony, for which the ALJ provided ample evidence to find inconsistences with the record." As the ALJ did not provide adequate reasons for discounting A.L.'s testimony, and did not otherwise give a germane reason for ignoring Ms. Aultman's statements, her failure to consider this lay witness evidence is not harmless.

### D. Assessment of Vocational Expert Testimony

A.L. argues that the ALJ's step-five finding was not supported by substantial evidence, because an apparent conflict existed between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT") that the ALJ should have recognized and asked the vocational expert to explain. Dkt. No. 20-1 at 24–26. A.L. also contends that the ALJ improperly omitted from the hypothetical posed to the vocational expert certain critical limitations on A.L.'s ability to perform work. Dkt. No. 20-1 at 22; Dkt. No. 23 at 10. The Commissioner responds that the ALJ properly evaluated the vocational expert testimony in conjunction with the DOT, as well as all the evidence to determine RFC best supported by substantial evidence. Dkt. No. 22 at 20–22. The Court agrees with A.L.

#### 1. Production-paced work

At step 5, "the Commissioner has the burden to identify specific jobs existing in substantial numbers in the national economy that [a] claimant can perform despite [his] identified limitations." *Zavalin v. Colvin*, 778 F.3d 842, 845 (9th Cir. 2015); *see also* 20 C.F.R.

§ 416.920(g). After assessing the claimant's RFC, the ALJ must consider potential occupations that the claimant may be able to perform. *Id.*; 20 C.F.R. § 416.966. In making this determination, the ALJ relies on the DOT, which is the Social Security Administration's "primary source of reliable job information" regarding jobs that exist in the national economy. *Zavalin*, 778 F.3d at 846 (citation omitted). The DOT describes the requirements for each listed occupation. *See, e.g.*, Code 753.687-038, "Packing-Line Worker (rubber goods)," Dictionary of Occupational Titles (4th ed., rev. 1991).

In addition to the DOT, the ALJ relies on the testimony of vocational experts who testify about specific occupations that a claimant can perform in light of her residual functional capacity. *Zavalin*, 778 F.3d at 846; 20 C.F.R. § 416.966(e). To conclude the step 5 analysis, the ALJ determines "whether, given the claimant's [residual functional capacity], age, education, and work experience, he actually can find some work in the national economy." *Zavalin*, 778 F.3d at 846 (citation omitted); *see also* 20 C.F.R. § 416.920(g).

"When there is an apparent conflict between the vocational expert's testimony and the DOT—for example, expert testimony that a claimant can perform an occupation involving DOT requirements that appear more than the claimant can handle—the ALJ is required to reconcile the inconsistency." *Zavalin*, 778 F.3d at 846 (quoting *Massachi v. Astrue*, 486 F.3d 1149, 1153–54 (9th Cir. 2007)). Before relying on the expert's testimony to reach a disability determination, the ALJ must ask the expert to explain the conflict and "then determine whether the vocational expert's explanation for the conflict is reasonable." *Id.*; *see also* Social Security Ruling 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000). The ALJ's failure to resolve an apparent inconsistency may preclude this Court from determining that the ALJ's decision is indeed supported by substantial evidence. *Zavalin,* 778 F.3d at 846 (quoting *Massachi*, 486 F.3d at 1154).

As an initial matter, the vocational expert's testimony did not account for the limitation the ALJ identified with respect to limiting the claimant to task-oriented, as opposed to production-paced, work. In response to the third hypothetical posed by the ALJ, which added the limitation of "work[ing] best in an environment that was task oriented, as opposed to production pace," AR 88, the vocational expert modified her job estimates, reducing the number of laundry folder

positions available by 20%, the number of packing line worker positions available by 75%, and the number of assembler of small products positions available by 50%. AR 88–89. But the vocational expert did so in reliance on her own interpretation of "production pace[d]" work as distinguished from "task oriented work." *See* AR 90 (vocational expert testified that work at a "production pace has to deal more with having more strict numbers," while "task-oriented work" involves "completing tasks that the employer wants you [to] complete during a certain [] period of a day"). The vocational expert's definition of production-paced work is inconsistent with ALJ's explanation that production-paced work is work at a set pace, such as on an assembly line. *See* AR 91 (ALJ explained that production-paced work is "set independent of the worker" "because it's an assembly line" or because "there's somebody else relying on that worker to get their work done at[] a certain pace"). The vocational expert appears to have based her opinion of the number of jobs available on a somewhat different understanding.

Given the ALJ's definition of production-paced work, an apparent conflict exists between the vocational expert's testimony and the DOT that the ALJ should have recognized and asked the vocational expert to explain. *See Zavalin*, 778 F.3d at 846. The DOT description of assembler of small products, provides, in relevant part: "Performs any combination of following repetitive tasks *on assembly line* to mass produce small products … Frequently works at bench *as member of assembly group* assembling one or two specific parts and *passing unit to another worker*." Code 706.684-022, "Assembler, Small Products I (any industry) alternate titles: bench assembler," Dictionary of Occupational Titles (4th ed., rev. 1991) (emphases added). Similarly, the DOT description of packing-line worker provides, in relevant part: "Performs any combination of following tasks *as member of conveyor line crew* to finish and pack plastic or rubber footwear." Code 753.687-038, "Packing-Line Worker (rubber goods)," Dictionary of Occupational Titles (4th ed., rev. 1991) (emphasis added). Such work is the sort of activity the ALJ described as "production-paced work" that A.L. could not perform.

Such error was not harmless. While the laundry folder job does not have a production pace requirement, there are only 2,400 "folder (laundry & rel.)" jobs nationwide. AR 88. It is not clear from the record where these jobs exist and whether there are a significant number of such jobs in

the national economy. *See* 20 C.F.R. § 404.1566(b) ("Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy""); *Randazzo v. Berryhill*, 725 F. App'x 446, 448 (9th Cir. 2017) (10,000 electrical accessories assembler jobs "may not amount to a significant number of jobs in the national economy"); *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 528–29 (9th Cir. 2014) (25,000 jobs in the national economy presented a close call but was a sufficiently significant number); *Beltran v. Astrue*, 700 F.3d 386, 390 (9th Cir. 2012) (given claimant's limitations, "it would be unconscionable" to expect her to find even one of the "1,680 [surveillance system monitor] jobs scattered across several regions").

### 2. Additional limitations

A.L. argues that the ALJ's hypothetical improperly omitted limitations based on Dr. Haycraft's opinions, A.L.'s own testimony, and her mother's statement. Dkt. No. 20-1 at 22; Dkt. No. 23 at 10. A.L.'s argument on this point is not well-developed, and she does not say precisely what limitations she believes should have been included in the ALJ's RFC. However, as discussed above, because the ALJ improperly discounted Dr. Haycraft's medical opinions and A.L.'s own testimony concerning her symptoms, and failed to consider A.L.'s mother's statements, it will be necessary for the ALJ to reconsider the limitations on A.L.'s ability to perform work on remand.

## IV. DISPOSITION

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). Because it is not clear from the record that the ALJ would be required to find A.L. disabled if all the evidence were properly evaluated, remand is appropriate. On remand, the ALJ must reassess Dr. Haycraft's opinions in view of the record as a whole and provide legally adequate reasons for any portion of that opinion or statement that the ALJ discounts or rejects. The ALJ must provide clear and convincing reasons for discounting A.L.'s testimony concerning her symptoms; the ALJ also must consider Ms. Aultman's statement.

1  Further, the ALJ should reconsider A.L.'s RFC and reassess whether specific jobs exist in
2  substantial numbers in the national economy that A.L. can perform despite her limitations.

## V. CONCLUSION

Based on the foregoing, A.L.'s motion for summary judgment is granted on the grounds explained above, the Commissioner's cross-motion for summary judgment is denied, and this matter is remanded for further proceedings consistent with this order. The Clerk of the Court shall enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

Dated: December 6, 2021

VIRGINIA K. DEMARCHI
United States Magistrate Judge